Estate of Robert S. Bickley, Deceased, Georgia Bell Bickley, Executrix v. Commissioner. Estate of Robert S. Bickley, Deceased, Georgia Bell Bickley, Executrix, and Georgia B. Bickley, Individually v. Commissioner.
Estate of Bickley v. Commissioner
Docket Nos. 63747, 63748.
United States Tax Court
T.C. Memo 1960-63; 1960 Tax Ct. Memo LEXIS 226; 19 T.C.M. (CCH) 329; T.C.M. (RIA) 60063; March 31, 1960
*226 Charles Meyer, Esq., 60 Wall Street, New York, N. Y., for the petitioners. James J. Quinn, Esq., and Herbert Rothenberg, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in income tax and additions to tax under section 293(b) [1] as follows: Docket
Addition to Tax
Petitioner
No.
Year
Deficiency
Sec. 293(b)
Est. of Robert S. Bickley, Deceased, Georgia Bell
Bickley, Executrix
63747
1946
$78,715.06 n2
$40,458.84 n2
1947
37,471.70
18,735.85
Est. of Robert S. Bickley, Deceased, Georgia Bell
Bickley, Executrix, and Georgia B. Bickley,
Individually
63748
1948
46,596.44
23,298.22
1949
23,878.80
11,939.40
1950
34,145.98
17,072.99
At the trial, the petitioners did not contest the deficiencies determined by the respondent for any of the years. The only issue is whether all or part of the deficiencies *227 with respect to the taxable years 1946-1950, inclusive, are due to fraud with intent to evade and defeat payment of tax within the meaning of section 293(b). Findings of Fact The petitioners, Robert S. Bickley (sometimes hereinafter referred to as Bickley), and Georgia B. Bickley, are individuals, husband and wife, resident in New York City during the years involved. The separate returns of Bickley for 1946 and 1947 and the joint returns of Bickley and his wife, Georgia, for 1948, 1949, and 1950, were all filed with the collector for the third district, New York. Bickley died on December 26, 1957, and his estate was substituted as petitioner. During all years in issue, Bickley was a practicing general surgeon. He was associated with the Flower and 5th Avenue Hospital, New York City, and maintained offices at 75 Central Park West, New York City. Bickley generally kept office hours from 7:30 in the morning until 9:30 or 10 o'clock in the evening. The first floor of his duplex office suite consisted of a large waiting room, a private office, four treatment rooms, and two diathermy rooms. The second floor consisted of a kitchen, an X-ray room, an operating room, and a patient recovery *228 room. His staff consisted of a receptionist, a secretary, two nurses, and a laboratory technician. He also employed a private chauffeur. Sometime in the year 1945 Bickley began to purchase farms in the vicinity of Watertown, New York. Up to and including the year 1950, he had acquired a total of 14 farms in the Watertown area. The depreciable costs of the farms alone, i.e., exclusive of land costs, exceeded $430,000. Prior to the year 1949 he failed to report the ownership or operation of any of the 14 farms for income tax purposes. In each of the years involved, the respondent determined that the operation of the farms resulted in a loss which was taken into account in respondent's deficiency determinations. Bickley maintained a check book and a payroll book at his office. He did not keep a cash book or any other books of original entry. He maintained patient history cards covering all the years involved. With the exception of operations, payments by patients were not generally entered on these cards. Since 1938, Benjamin Krumholz, a public accountant, had been engaged by Bickley to prepare a monthly summary of Bickley's income and expenses from an analysis of the check book. *229 Krumholz was paid $50 per month for his services. Krumholz maintained a cash book in which he recorded monthly Bickley's professional receipts as reflected by the taxpayer's deposits in the Guarantee Trust Company Bank, 44th Street, New York City, New York (hereinafter referred to as the Guarantee account), for each of the calendar years 1946-1950, inclusive. Bickley's office furnished him the bank statements and cancelled checks. However, for the years 1946-1948, inclusive, such bank statements and cancelled checks pertained only to the Guarantee account and, prior to 1949, Krumholz was furnished no information whatsoever by Bickley or his employees with regard to any other account. On May 15, 1946, Bickley opened a checking account at the Maplewood National Bank, Maplewood, New Jersey (hereafter referred to as the Maplewood account). Maplewood, New Jersey, is approximately 27 miles from New York City. Several times each month, Henry Gross, Bickley's personal chauffeur, would drive either Bickley, his wife, or Bickley's secretary, Marie Russell, to Maplewood, New Jersey, where they would make deposits in Bickley's account. Most of the deposits in the Maplewood account were in the *230 form of currency or cash deposits as distinguished from check deposits. The following schedule reflects total deposits and the currency (cash) portion thereof deposited in the Maplewood account in each of the taxable years 1946-1950, inclusive: Total De-
Currency
Year
posits
Deposits
1946
$136,193.92
$107,970.84
1947
199,349.53
144,872.00
1948
178,780.15
142,905.00
1949
59,985.00
Amount
unknown
1950
None
None
The Maplewood account was closed on December 5, 1950. Marie Russell was employed as Bickley's secretary from the latter part of 1945 or the beginning of 1946 until May 1952. Bickley personally opened all office mail and did not turn over any of the checks contained therein to his secretary. Bickley would write an amount on the envelope which was purportedly the amount of the payment. He then would give the marked envelope to his secretary who would note the amount on the patient's history card. When Krumholz visited Bickley's office each month to analyze the Guarantee account he was furnished the check book by Russell in the presence of Bickley as well as the payroll book. Bickley kept all check books and deposit slips in his *231 personal desk drawer, and Russell only had access to such records in Bickley's presence. Throughout all of the tax years in question Bickley continued to exercise the same complete dominion and control over the financial affairs of the office. Marie Russell made most of the Maplewood bank deposits. Bickley personally took the funds from his office safe, gave them to her and, either prepared the deposit slip himself, or had Russell prepare it. Bickley instructed Russell to which account he wanted the funds deposited. He generally deposited the currency in the Maplewood account and the checks in the Guarantee account. It took the secretary approximately 45 minutes to make the trip to the Guarantee Trust Company Bank whereas it took her the entire morning, from 9:00 A.M. to 12:00 P.M., to make the trip to the Maplewood Bank. Bickley would also instruct his secretary to prepare deposit slips for the Watertown National Bank, Watertown, New York. These deposits consisted only of checks and were sent by mail to the Watertown National Bank. The Watertown account was used primarily to handle Bickley's farm transactions. This account was maintained in the names of Georgia B. Bickley or Mrs. *232 Paul Read, c/o Dr. R. S. Bickley, 75 Central Park West, New York. Mrs. Paul Read is the daughter of Bickley. Approximately one month prior to the due date for filing of Bickley's income tax returns, Krumholz would have a conference with Bickley at the latter's office and review with him at that time the return he planned to file. On those occasions, Krumholz requested Bickley to furnish him with all information as to any other income he had received during the year other than the professional fees deposited in the Guarantee Trust Company Bank. At the conferences which related to his 1946, 1947, and 1948 returns, Bickley told Krumholz that the only additional income he had which was not deposited in the Guarantee account was in the respective following amounts: Year
Amount
1946
$7,500
1947
5,200
1948
7,500
In April 1949, Bickley executed a power of attorney in favor of Joseph D. Nunan, Jr., Bertram F. Bongard, Talbot M. Malcolm, and Douglas H. Thayer of No. 55 Liberty Street (hereinafter referred to as the law firm of Tolbert, Nunan and Bongard), and Louis Herman, 149 Broadway, New York City. On April 12, 1949, the following letter was received by the internal *233 revenue service from the law firm of Tolbert, Nunan and Bongard: "April 11, 1949. N * "Mr. Ralph Wheeler, Agent in Charge, 341 Ninth Avenue, New York 1, N. Y. "Dear Mr. Wheeler: "This is to notify you that, very shortly, I expect to file a voluntary disclosure for additional income on behalf of a Dr. Bigley [Bickley] of New York City. "Very truly yours, [sgd.] Joseph D. Nunan, Jr." On May 9, 1949, the following letter was received by the internal revenue service from the law firm of Tolbert, Nunan and Bongard: "May 6, 1949. Th- "Internal Revenue Agent in Charge, 341 Ninth Avenue, New York, N. Y. "Sir: "In re: Robert S. Bickley "Reference is made to our letter of April 11, 1949, advising that a voluntary disclosure of additional income would be made on behalf of the above named taxpayer. "Dr. Bickley's Income Tax Reports were prepared by an accountant from his office books and records and from an examination made of his account with the Guaranty Trust Company of the deposits and withdrawals there shown. An estimate was made in each year of his unrecorded cash receipts and these were added to the gross income reported in his Return, as for example in the year *234 1948, the sum of $7,500.00. Unknown to the accountant preparing his returns, Dr. Bickley had acquired a farm or farms in Watertown, N. Y., in 1943, to which he has made from time to time, additions and improvements. The main source of the moneys invested in this farm was a bank account with the Maplewood National Bank & Trust Company of Maplewood, N.J., into which deposits amounting to $471,490.00 were made commencing on February 14, 1946 through December 31, 1948, some of which were made both in cash and by check. The moneys here deposited to the extent that they cannot be accounted for represent unreported income of the taxpayer. "It is requested that an Agent be assigned to make an examination of Dr. Bickley's books, accounts and returns as soon as possible. "Respectfully, TOLBERT, NUNAN & BONGARD By: Douglas H. Thayer" On May 13, 1949, the following letter was received by the internal revenue service from the law firm of Tolbert, Nunan and Bongard: "May 12, 1949. Th- "Internal Revenue Agent in Charge, Upper New York Division, 341 Ninth Avenue, New York, N. Y.
"Attention: Mr. John M. Reagan. "In re: Robert S. Bickley "Sir: "Supplementing our letter of May 6, 1949, we *235 wish to inform you that receipts from the operation of the farm owned by the above named taxpayer were deposited in an account with the Watertown National Bank, Watertown, New York, standing in the name of Georgia D. Bickley and/or Georgiabell Bickley Read, and may insofar as not offset by expenditures, constitute income of the taxpayer. "Respectfully, TOLBERT, NUNAN & BONGARD, By: Douglas H. Thayer" During the taxable year 1949 Bickley sold stock most of which he had acquired in the year 1936 and realized $63,812.51 on the sales. Bickley's stock sales resulted in a net loss of $15,529.42. During the taxable year 1950, Bickley sold real estate he had acquired in 1935 and realized $10,000 on the sale. This sale resulted in a net loss of $600. He also redeemed certain life insurance policies and U.S. Savings Bonds during the taxable year 1950. It was during the early part of the year 1950 when Krumholz was preparing Bickley's 1949 tax return that Bickley first informed him that he also maintained bank accounts at the Maplewood National Bank, Maplewood, New Jersey, and at the Watertown National Bank, Watertown, New York. Prior to the early part of 1950, Bickley had never informed *236 his accountant of the existence of either of these bank accounts. Krumholz was then furnished with bank statements for those accounts and reported the professional fees deposited therein during 1949 in Bickley's income tax return for that year. Krumholz also reported the farm operations on Bickley's 1949 and 1950 income tax returns. On April 9, 1953, Bickley revoked any power of attorney previously given to anyone in connection with Federal income tax matters, including the power of attorney granted to the law firm of Tolbert, Nunan and Bongard, and executed a power of attorney in favor of Farrington and Adams, certified public accountants, Watertown, New York. Revenue agent Max Eisner was subsequently assigned to the case. In the early part of 1953, Eisner contacted Bickley's then representative Howard F. Farrington, C.P.A., of Watertown, New York. A joint decision was reached by Eisner and Farrington to determine Bickley's professional income from his patients' history cards. Farrington then engaged the services of the certified public accounting firm of J. R. Hanna and Co., 551 Fifth Avenue, New York City, to perform the necessary audit in New York City. Eisner, Hanna, and *237 an assistant of Hanna worked for approximately three months in the early part of 1953 at Bickley's office tabulating data from approximately 50,000 patient history cards. The numerical tabulation was made on the basis of office visits, operating fees (only actual dollar amounts were employed for operations), electrocardiograms, X-rays, and basal metabolism tests. This data was then summarized. The only dollar amounts generally appearing on the patient history cards were those with respect to operating fees. After the results were so tabulated, both Eisner and Hanna requested Bickley to furnish them with a schedule of the fees he actually charged for his professional services. He furnished Eisner and Hanna with the following fees: Office Visit - 1946, 1947
$ 2.00
1948
2.50
1949, 1950
3.00
Electrocardiogram
5.00
X-ray
10.00
Basal Metabolism tests
5.00
These rates were then applied to the numerical tabulation, referred to above, to arrive at Bickley's professional gross income for each of the years in question. The schedule of rates actually charged by Bickley for his professional services during 1949 and 1950 were as follows: Office Visits
$ 3.00 - $ 5.00
Electrocardiogram
10.00 - 15.00
X-ray's
Chest
5.00 - 10.00
G. I. Series
15.00 - 20.00
Basal Metabolism tests
10.00
*238 During each of the taxable years in question, Bickley received professional gross income which he failed to report on his income tax return in the following amounts: Year
Amount
1946
$134,597.07
1947
126,403.60
1948
151,904.49
1949
94,304.43
1950
74,344.71
In each of the taxable years in question, Bickley reported the following gross income from professional fees: Year
Amount
1946
$ 61,560.18
1947
60,107.75
1948
72,414.46
1949
145,268.07
1950
152,006.89
With respect to each of the years 1946 to 1950, inclusive, a part of the deficiency was due to fraud with intent to evade tax. Opinion The respondent determined Bickley's gross income from professional sources by tabulating the information shown on the patient history cards and applying to the data thus tabulated a schedule of fees supplied by Bickley. The respondent's deficiency determination was in large part based upon this reconstruction. That there may have been some inaccuracies in the details of the reconstruction would not occasion surprise in view of the approximately 50,000 cards involved. However, we are satisfied from the evidence that the respondent's method *239 of reconstruction of Bickley's income was entirely reasonable under the circumstances and was not arbitrary. The amount of the deficiencies so determined is not at issue. The petitioners do not contest the deficiencies. The evidence establishes clearly that in each of the years in question Bickley received very substantial amounts of professional fees which he failed to report on his Federal income tax returns. Bickley kept limited financial records, considering the volume of his business. However, such records as there were, such as check books and bank statements, were kept by him in his own desk. It was he who had custody of the books; he who opened the mail and from it extracted the checks; he who directed the making of deposits in his several bank accounts; he who either made the deposit slips or supervised their making; he who took the cash from the safe prior to the deposit; and he who consulted with the accountant in the preparation of his tax returns. There is no doubt but that Bickley had an exceedingly heavy practice. However, there is also no doubt but that he somehow found time to control completely his own financial affairs. During the years 1946, 1947, and 1948, *240 Bickley supervised the making of very substantial deposits, mostly cash, in his Maplewood, New Jersey account. Some of these deposits were made by Bickley in person. The existence of that account was not disclosed to his accountant by Bickley until early 1950 when the 1949 return was being prepared. Until that time, only the Guarantee bank statements were furnished the accountant for the purpose of preparing the returns. Likewise, the Watertown account was not disclosed by Bickley to his accountant until 1950. The existence or operation of his fourteen farms in the Watertown area was not reflected on his returns for 1946-1948, inclusive. With respect to each of the years 1946 to 1948, his accountant while working on the returns for those years specifically inquired of Bickley if he had any other income not reflected on the Guarantee account. The amounts disclosed by Bickley on these occasions were so minor in relation to the total unreported income as to be insignificant and to constitute a positive hiding of information. With respect to 1949 and 1950, it is true that Bickley disclosed the Maplewood and Watertown accounts. However, although the amounts involved were less than those *241 in the three preceding years, Bickley failed to report in both 1949 and 1950 very substantial amounts of professional income determined through the patient history cards as in the prior years. With respect to 1949 and 1950, Bickley furnished a schedule of fees which was less than that which he in fact charged. The respondent has established by clear and convincing evidence a pattern of fraudulent conduct which existed and continued throughout the period 1946-1950, inclusive, and we have found that a part of the deficiency for each of those years was due to fraud with intent to evade tax. Decisions will be entered for the respondent. Footnotes
1. All section references herein are to the Internal Revenue Code of 1939. n2 Due to a concession made by respondent, the deficiency and addition to tax for the taxable year 1946 are reduced to $76,601.31 and $39,401.97, respectively.↩